UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | |
| ) | Case No. 06 CR 545 |
| JAMES E. SPAIN, CATALINO UY, and ) | |
| CROWN CHEMICAL, INC. ) | Judge Joan B. Gottschall |

## MEMORANDUM OPINION AND ORDER

In this case, defendants Crown Chemical, Inc. ("Crown"), James E. Spain ("Spain"), and Catalino Uy ("Uy") (collectively "defendants") were indicted by a grand jury for, *inter alia*, discharging pollutants into the Metropolitan Water Reclamation District of Greater Chicago ("MWRD") sewer system in violation of the Clean Water Act, 33 U.S.C. §§ 1251 *et seq.* (2006) ("CWA"). Crown is a manufacturer of chemical cleaning products located in Crestwood, Illinois, Spain is Crown's President and controlling shareholder, and Uy was Crown's General Manager during the relevant time period. Defendants have collectively moved to suppress all evidence obtained through the execution of three search warrants by the Environmental Protection Agency ("EPA"), arguing that the EPA's searches violated their Fourth Amendment rights. For the reasons discussed below, defendants' motion to suppress is denied in its entirety.

### I. BACKGROUND

The facts recited below are drawn primarily from the affidavits submitted by EPA Special Agent John Singler ("Singler") in support of the EPA's warrant applications, as it is these facts that defendants allege failed to establish probable cause for the warrants. The MWRD is a publicly owned treatment works facility ("POTW") that holds a National Pollutant Discharge Elimination System ("NPDES") permit pursuant to 33 U.S.C. § 1342 (2006). As a POTW, the MWRD is responsible for collecting and cleansing wastewater from industrial,

1

commercial, and residential sources in the Greater Chicago area before discharging that wastewater into surface water bodies such as lakes and rivers. In conjunction with its NPDES permit, the MWRD established a pre-treatment program known as the MWRD Sewage and Waste Control Ordinance ("the Ordinance"). *See* 40 C.F.R. § 403.8(a) (2007) (requiring any POTW with the capacity to treat more than five million gallons of wastewater per day to develop a pre-treatment program). The Ordinance is designed to regulate discharges into the MWRD sewer system, and it incorporates and implements many of the standards set forth in the EPA's regulations. It became federally enforceable—violations may be prosecuted pursuant to the criminal offense provision of the CFA, 33 U.S.C. § 1319(c) (2006)—when it was approved by the EPA in 1985. Of particular relevance to the pending motion, the Ordinance prohibits wastewater with a pH reading[1] of less than 5.0 or greater than 10.0 from being discharged into the MWRD sewer system.[2] In addition to the Ordinance, the MWRD also established a permitting process whereby industrial users that are subject to the EPA's categorical pre-treatment standards—standards applicable to businesses engaged in particular industries—must obtain a permit to discharge wastewater into the MWRD sewer system.

On January 20, 1995, Crown (through Spain) applied for a permit to discharge non-industrial sewage into the MWRD sewer system. In the application, Crown described its business as a "Commercial and Recreational facility," and neglected to check "boxes which would have indicated that Crown Chemical included Industrial Buildings and that [i]ndustrial waste is produced by Crown Chemical." Defs.' Mot. to Suppress Ex. A (internal quotation

---

[1] The government provides the following description of pH levels in its opposition brief: "pH is a measure of a substance's relative acidic or caustic character. The pH scale runs from 0-14, with a reading of 7 being neutral." Pl.'s Resp. to Defs.' Mot. to Suppress 2 n.2.
[2] The EPA's general pretreatment regulations contained in 40 C.F.R. § 403.5 (2007) (promulgated pursuant to 33 U.S.C. § 1317(d) (2006)) also prohibit, among other things, the discharge of wastewater with a pH of less than 5.0 into a POTW such as the MWRD. *See* 40 C.F.R. § 403.5(b)(2).

marks omitted). Crown received its permit on February 8, 1995. In relevant part, the permit states that "discharges into the sanitary sewer system constructed under this permit shall consist of sanitary sewage only," and that "discharge of industrial waste is forbidden." *Id.* (internal quotation marks omitted). These restrictions are relevant, according to the government, because—as discussed below—Crown discharged industrial waste into the MWRD sewer system on a daily basis, but never notified the MWRD of the discrepancy between the discharges allowed by the permit and the discharges Crown was actually making. According to Singler's affidavit and the government's opposition brief, this was a violation of federal regulations. *See* 40 C.F.R. § 403.12(j) (2007) (industrial users subject to the EPA's categorical pre-treatment standards are required to notify the POTW of "any substantial change in the volume and character of pollutants in their discharge").[3]

On November 22, 2000, a large amount of foam was unexpectedly discharged from the sewer system into the streets of Crestwood. The Crestwood Fire Department responded to a call reporting the foam. Upon arriving at the scene, Crestwood fire marshal Kevin McAuliffe ("McAuliffe") determined that the substance arising from the sewer was white, soapy bubbles. McAuliffe, along with an official from the MWRD, proceeded to Crown to investigate, as Crown is the only business in the area that manufactures soap. McAuliffe and the MWRD official were unable to obtain any conclusive evidence that Crown was responsible for the foam, but the

---

[3] Crown disputes that it was an industrial user subject to the EPA's categorical pre-treatment regulations, appending to its brief a letter from the MWRD dated December 19, 2003, whereby the MWRD determined that Crown is *not* subject to such standards. *See* Defs.' Mot. to Supress Ex. D. In opposition, the government contends that the standards were applicable to Crown during the relevant time period. Indeed, the letter attached to defendants' brief indicates that prior to December 19, 2003, Crown was apparently required to comply with the categorical pre-treatment standards for soap and detergent manufacturers found at 40 C.F.R. § 417 (2007). The court need not resolve the dispute, however, because it is has little bearing on the pending motions. The parties agree that, pursuant to the EPA's pre-treatment regulations and the Ordinance, Crown was prohibited from discharging pollutants with a pH of less than 5.0 or greater than 10.0 into the MWRD sewer system, regardless of Crown's status as an industrial user subject to categorical pre-treatment regulations. As discussed *infra*, the EPA had probable cause to believe defendants were violating these regulations by the time it obtained the third warrant, the only one it was required to obtain in this case.

MWRD's report of the incident indicated that the MWRD considered Crown "a source of the foaming incident." Defs.' Mot. to Suppress Ex. A (internal quotation marks omitted). Singler interviewed McAuliffe on September 17, 2001, and his affidavit in support of the warrants includes McAuliffe's account of the incident.

On December 26, 2000, the MWRD received a complaint from an employee (referred to as "Employee One" in Singler's affidavits, *see id.*) who had recently been fired by Crown. Employee One informed the MWRD that Crown was illegally discharging pollutants into the MWRD sewer system on a regular basis. However, the MWRD could not investigate Employee One's allegations at the time because the sewer system was inaccessible—the manhole covers from which the MWRD accesses the sewer system were allegedly frozen shut. On February 6, 2001, Employee One also contacted the EPA through Singler. Singler interviewed him on February 8, 2001. In the interview, Employee One told Singler that he had been employed at Crown from approximately October 1, 2000, until December 23, 2000. During his employment, Employee One's supervisors regularly instructed him to dump pollutants down Crown's drains, which lead directly to the MWRD sewer system. Specifically, Employee One told Singler that Crown dumped excess product left over after soap, dye, and other products were produced into its drains approximately five times each day. He also stated that he regularly used a hose to flush chemical residue from Crown's mixing tanks into the floor drains. Finally, Employee One informed Singler that on November 22, 2000—the day of the so-called foaming incident— Crown produced a batch of dish soap that proved to be defective, and Crown's management directed Crown's employees to dump the entire batch (according to Employee One, approximately 250 gallons) into the MWRD sewer system.

After verifying that Crown was still operating its business, Singler applied for the first warrant on September 21, 2001, relying on the information set forth above. The application sought permission to covertly enter the MWRD sewer system via an unlocked and removable[4] manhole cover located on Crown's property—specifically, on the driveway in front of Crown's office building and approximately thirty to forty feet from the nearest public street. The driveway was unfenced, and Crown had taken no measures to restrict access to the manhole or discourage its use as a point of entry to the MWRD sewer. Once in the sewer system, the EPA would locate the point at which Crown's sewer line flows freely[5] into the MWRD sewer system. The EPA would then place testing equipment both within Crown's sewer line and upstream from Crown's sewer line to monitor the pH levels of wastewater discharged by Crown and that which had not yet reached Crown's junction. According to Singler, it was necessary to conduct this testing without Crown's knowledge in order to verify whether Crown was actually discharging wastewater into the MWRD sewer system in violation of the Ordinance and the CWA.

The magistrate judge granted the EPA's warrant application. On September 23, 2001, the EPA surreptitiously entered the manhole on Crown's driveway and installed the pH monitoring equipment. The devices monitored the pH levels of Crown's wastewater and the wastewater in the MWRD sewer line continuously for one week. The EPA removed them on September 30, 2001, and performed a preliminary analysis on October 3, 2001. The EPA's review indicated that Crown's wastewater during the week of monitoring ranged in pH level from 2.0 (a highly acidic reading) to 12.0 (a highly caustic or base reading). In contrast, the pH levels of the

---

[4] The government asserts that the manhole was easily removable via a special tool used to pry it out of the ground. As defendants have not contested this assertion, the court accepts it as true.
[5] It is undisputed that Crown's wastewater, once deposited into Crown's sewer line, flows irretrievably into the MWRD sewer system; there is no mechanism in Crown's sewer line to collect or store Crown's wastewater.

wastewater upstream from Crown were only 6.0 to 8.0, which, according to the EPA, is the typical range for sanitary sewage.

After receiving the test results, the EPA applied for a second warrant on October 4, 2001. In support of the warrant application, Singler submitted an affidavit that was virtually identical to the one he submitted in support of the first warrant. Indeed, as far as the court can tell, the only difference between Singler's first affidavit and his second is that the second includes a summary of the test results obtained during the initial one-week monitoring period. The second application sought permission to conduct a second week of covert sampling, just as the EPA had conducted pursuant to the first warrant. The second warrant was issued by the magistrate judge the same day as the EPA applied for it, and the EPA monitored Crown's wastewater from October 7, 2001, until October 14, 2001. According to the EPA, Crown's wastewater again tested outside the typical pH range—6.0 to 8.0—for sanitary sewage, while the wastewater upstream from Crown was normal.

Finally, on October 30, 2001, the EPA applied for a warrant to search Crown's entire facility. Singler's affidavit accompanying the third warrant application again recited much of the same information that was contained in the first and second warrant applications, and also summarized the results of the EPA's two separate weeks of testing. The magistrate judge approved the warrant the same day, and the EPA executed the warrant on November 1, 2001.

## II. ANALYSIS

Defendants raise a multitude of arguments in their attempt to demonstrate that the searches executed by the EPA pursuant to the three warrants violated defendants' Fourth Amendment rights. The majority of defendants' contentions need not be addressed, however, because their position fails at the threshold. As the government notes, not all searches fall within

the ambit of the Fourth Amendment. When a defendant challenges a search as unconstitutional, the court's initial inquiry is whether there has been a "search" within the meaning of the Fourth Amendment at all. *See, e.g.*, *Kyllo v. United States*, 533 U.S. 27, 31 (2001) (noting that "whether or not a Fourth Amendment 'search' has occurred" is the "antecedent question"). A Fourth Amendment search occurs only when: (1) the defendant manifested a subjective expectation of privacy in the area searched; and (2) the defendant's expectation is one that society is willing to recognize as objectively reasonable. *Id.* at 33; *California v. Greenwood*, 486 U.S. 35, 39 (1986); *Smith v. Maryland*, 442 U.S. 735, 740-41 (1979). Applying this test, several courts have concluded—on facts virtually identical to those presently before the court—that wastewater monitoring is not a search under the Fourth Amendment. *See Riverdale Mills Corp. v. Pimpare*, 392 F.3d 55, 63-65 (1st Cir. 2004); *United States v. Hajduk*, 396 F. Supp. 2d 1216, 1224-26 (D. Colo. 2005); *People v. Elec. Plating Co.*, 683 N.E.2d 465, 466-70 (Ill. App. Ct. 1997). As discussed below, the court agrees with the reasoning in these cases and likewise finds that the EPA did not conduct Fourth Amendment searches when it tested defendants' wastewater pursuant to the first and second warrants. The EPA was therefore not required to obtain the first and second warrants in the first place, and defendants' objections to those warrants are moot.[6] *See Smith* 442 U.S. at 746 (holding that "installation and use of a pen register" on defendant's telephone line to trace his calls was not a Fourth Amendment search and, consequently, "no warrant was required").

---

[6] As there is no dispute that the third warrant resulted in a Fourth Amendment search of defendants' business premises, the relevant question with respect to that warrant is whether Singler's affidavit established probable cause to justify the search. *See Griffin v. Wisconsin,* 483 U.S. 868, 873 (1987) (searches may typically be made only pursuant to a warrant supported by probable cause); *United States v. Peck*, 317 F.3d 754, 755-56 (7th Cir. 2003) (where affidavit is only evidence presented to magistrate judge, affidavit must establish probable cause for the warrant). The court will address this question after taking up the threshold inquiry with respect to the first and second warrants.

In *Riverdale Mills*, the First Circuit considered whether warrantless sampling of wastewater beneath a wire manufacturer's business premises constituted a search for Fourth Amendment purposes. 392 F.3d at 56. The wire manufacturer, Riverdale Mills Corporation ("Riverdale"), had a state permit allowing it to discharge wastewater into the POTW so long as the discharges did not exceed certain pH levels. *Id.* at 57. The EPA was informed by an anonymous source that Riverdale was in fact discharging wastewater with improper pH levels, so the EPA sent two agents to perform an inspection. *Id.* Without a warrant or consent, the agents took samples of wastewater from the sewer underneath a manhole on land owned by Riverdale. *Id.* at 57, 58. The First Circuit noted that the manhole was "covered by an unmarked 171-pound steel manhole cover" and was located on a paved street running alongside Riverdale's manufacturing plant. *Id.* at 57. The portion of the sewer pipe where the samples were taken was 300 feet from the point where Riverdale's sewer joined with the public sewer system. *Id.* Based on the results of the samples taken from the manhole, the EPA obtained an administrative search warrant and searched Riverdale's facility; a criminal search warrant was later executed. *Id.* at 59. Riverdale and its owner were subsequently indicted for violating the CWA by discharging pollutants with excessive pH levels into the POTW, although the government ultimately dismissed the indictment. *Id.*

After the indictment was dismissed, Riverdale and its owner sued the EPA agents who had conducted the sampling, alleging that their Fourth Amendment rights had been violated. *Id.* at 57. The EPA agents defended on grounds of qualified immunity, placing the Fourth Amendment question squarely before the First Circuit. *Id.* at 61. The court noted that "[t]he threshold issue" was whether a Fourth Amendment search had even occurred. *Id.* at 63. Assuming that "Riverdale had a subjective expectation of privacy," the court considered only

8

whether Riverdale's expectation was objectively reasonable. *Id.* Specifically, the court defined the issue before it as follows: "[W]hether a company has a reasonable expectation of privacy in industrial wastewater that is on a private street and underneath a 171-pound manhole cover but 300 feet away from and flowing irrevocably into the public sewer system." *Id.* In addressing this question, the court considered a number of factors, noting that whether an expectation of privacy is reasonable is often a fact-specific inquiry. *Id.* at 63-64. The court pointed out that Riverdale was a commercial enterprise, and was therefore entitled to less privacy than a private residence. *Id.* at 64 (citing *Dow Chem. Co. v. United States*, 476 U.S. 227, 237-38 (1986)). The court also noted that the manhole where the EPA agents drew their samples was located on Riverdale's property, but that it "was located on a private *road*; this street is an area of Riverdale property that is most akin to an open field rather than to a more heavily protected type of area, like curtilage or the interior of a home or business." *Id.* (citing *Dow Chem. Co.*, 476 U.S. at 235-37). The "controlling fact," however, was "that the wastewater . . . is *irretrievably* flowing into the public sewer, which is only 300 feet away." *Id.* The First Circuit concluded that, under these circumstances, Riverdale's wastewater was analogous "to trash left out on the curb for pick-up by the trash collector," which the Supreme Court has held "enjoys no reasonable expectation of privacy, even if left in opaque bags." *Id.* (citing *Greenwood*, 486 U.S. at 40-41). The court noted that the analogy was not exact, but that it controlled nonetheless because Riverdale's wastewater, like the trash bags, had been intentionally discharged by Riverdale into a sewer pipe which would carry it irretrievably to the public sewer system in a short amount of time. *Id.* The court therefore held that Riverdale had no reasonable expectation of privacy in its wastewater, and hence no Fourth Amendment search occurred when the EPA agents sampled Riverdale's discharged water from under the manhole. *Id.* at 65.

In *Hadjuk*, a chrome plating company and its manager were indicted for violating the CWA by wrongfully discharging industrial wastewater into the public sewer. 396 F. Supp. 2d at 1221-22. The defendants moved to suppress evidence gathered from their sewer line by the EPA and the POTW. *Id.* at 1224-25. As in the case before this court, the evidence was obtained by entering the sewer through a manhole located on the defendants' property. *Id.* at 1224. The manhole was "located in an unfenced and apparently unused area of [defendants'] property adjacent to a public street." *Id.* The sewer line under the manhole was only two feet from the point where it joined with the POTW's main sewer line, and there was no means of preventing the wastewater in defendants' sewer line from reaching the public sewer system. *Id.* As in this case, the EPA obtained a warrant to conduct surreptitious sampling, and it drew samples of the defendants' wastewater from the sewer line under the manhole. *Id.* After the samples indicated that the defendants were violating the CWA, the EPA obtained and executed a warrant to search the defendants' facilities. *Id.* at 1225. Citing *Riverdale*, the court determined that the defendants "could not have had a reasonable expectation of privacy in their wastewater flowing indisputably into the public sewer system." *Id.* at 1226. As in *Riverdale*, the court found that "[t]he analogy to trash left on the sidewalk is persuasive, since [the defendants'] wastewater was intentionally discharged as waste," and stated that the determinative factor "is that [the defendants' wastewater] was headed towards the public sewer system without any possibility or expectation of retrieval." *Id.* Accordingly, the court held that the sampling did not amount to a Fourth Amendment search. *Id.*

Finally, in *Electronic Plating Company*, the Illinois Court of Appeals considered whether evidence recovered by the MWRD that led to the defendants' indictment for violations of Illinois law had been obtained in violation of the Fourth Amendment. 683 N.E.2d at 466. The

defendants were Electronic Plating Company ("EPC") and two EPC officials. *Id.* Pursuant to its statutory authority, the MWRD had set up a sampling station inside EPC's manufacturing plant—specifically, in a sewer pipe that drained into the MWRD sewer system underneath a manhole on the floor of EPC's building. *Id.* at 467. When the MWRD was informed via an anonymous tip that EPC had bypassed the sampling station and was illegally discharging industrial waste into the MWRD sewer system, the MWRD sent a pollution control officer to investigate. *Id.* at 466-67. When the officer arrived at EPC, he proceeded to the sampling station, as he was entitled to do, but instead of drawing a sample at the sampling station he surreptitiously installed a probe that reached twenty-four feet further down EPC's sewer line. *Id.* at 467. Numerous samples taken by the probe indicated that EPC was violating the Ordinance, and the MWRD ultimately obtained a search warrant for EPC's facility, leading to the defendants' indictment. *Id.* Citing *Greenwood*, the Illinois Court of Appeals held that EPC did not have an objectively reasonable expectation of privacy in the wastewater contained in the sewer pipe where the probe was placed. *Id.* at 468-69. The court noted that EPC, as a commercial business, had a reduced expectation of privacy, and that EPC was required to allow the MWRD to sample its wastewater as a condition of its use of the public sewer system. *Id.* at 469. According to the court, "once EPC's pipe was connected to the [MWRD's] public sewer system, any expectation of privacy in the wastewater discharge contained in that pipe became objectively unreasonable. The wastewaters flushed into the pipe became a part of the public sewer system." *Id.* at 470. Thus, the court held that MWRD's sampling did not amount to a Fourth Amendment search. *Id.*

    The relevant facts of this case are virtually indistinguishable from those in the three cases discussed above. While none of those cases addressed the first component of the Fourth

11

Amendment search test, it warrants brief discussion here because, other than their after-the-fact objection to the EPA's testing, defendants did not exhibit any subjective expectation of privacy in the manhole. The manhole was located on Crown's unfenced driveway no more than forty feet from the public road, and Crown had done absolutely nothing to indicate that it considered the manhole to be a private area of its facility. Thus, aside from their objections here, defendants never manifested a subjective expectation of privacy in the area where the EPA conducted its tests.

Even assuming that the defendants have met their burden on the subjective component, however, any expectation of privacy that defendants had in the wastewater flowing from their sewer system into the MWRD's was objectively unreasonable. To test the wastewater, the EPA entered an unmarked manhole that was accessible to any person who happened to stroll onto Crown's driveway, located the point where Crown's wastewater flowed unabated into the public sewer system, and placed testing devices just inside Crown's sewer line. This was an extremely unobtrusive method of determining whether Crown was unlawfully discharging pollutants. Moreover, the EPA was testing a substance that Crown had clearly discarded—its wastewater— at the point where that substance entered the public sewer system and therefore became public waste subject to disposal by the MWRD. As with *Riverdale*, *Hadjuk*, and *Electronic Plating Company*, this is the determinative fact here. Defendants simply could not have an objectively reasonable expectation of privacy in wastewater that Crown had discharged into its sewer pipes and that was inches from entering the MWRD's sewer system. If anything, the facts of this case are even more compelling than those in the three cases discussed above because the EPA tested

Crown's wastewater *at the exact point* where that wastewater became public property.[7] The court therefore concludes that the EPA's testing of Crown's wastewater did not amount to a Fourth Amendment search. Consequently, the EPA was not required to obtain the first and second warrants in order to place the monitoring devices, and defendants' contention that those warrants lacked probable cause is moot.

While defendants' arguments with respect to the first and second warrants fail, defendants have also alleged that the third warrant lacked probable cause. To the extent that defendants' objections to the third warrant rest on their objections to the first and second warrants (defendants piggy-back their arguments, arguing that the third warrant is invalid because it relied on the improper fruits of the first and second warrants), those objections are moot. However, defendants also appear to argue that the third warrant, standing alone, lacks probable cause because it: (1) failed to establish evidence of a federal crime; (2) relied upon stale evidence; and (3) relied on evidence from a disgruntled former employee. *See* Defs.' Mot. to Suppress 13. Each of these arguments is without merit as to the third warrant.

First, the application for the third warrant clearly established evidence of a federal crime, even by defendants' own admission. Pursuant to the Ordinance, it is illegal to discharge pollutants with a pH of less than 5.0 or greater than 10.0 into a POTW. The general pre-treatment regulations found at 40 C.F.R. § 403.5(b)(2) (2007) likewise prohibit discharges with a pH of less than 5.0. On the instant motion, it is undisputed that the EPA's monitoring of

---

[7] Indeed, defendants do not advance any arguments to distinguish *Riverdale*, *Hadjuk*, and *Electric Plating Company*, instead simply arguing that that none of those cases is binding and conclusorily stating that "it is unimaginable that society would not accept an expectation of privacy in sewers and wastewater as objectively reasonable when what people flush down their toilets and put down their drains many times contain some of the most intimate details of people's lives." Defs.' Reply in Supp. of Mot. to Suppress 3. Tellingly, however, defendants do not cite a single case in support of their position. While the court agrees that situations may exist in which wastewater is entitled to constitutional protection, those situations are not before the court. On the facts and circumstances presently before this court, any expectation of privacy defendants had in Crown's wastewater was objectively unreasonable.

Crown's wastewater revealed that Crown was discharging wastewater in violation of these federal requirements. Furthermore, Singler's affidavit submitted in support of the third warrant described the test results, and also recited the relevant federal requirements. *See* Defs.' Mot. to Suppress Ex. C (citing the Ordinance and 40 C.F.R. § 403.5). Singler's affidavit therefore established probable cause to believe that a federal crime was continually being committed at Crown.

Second, the probable cause evident on the face of the third warrant application is not tempered by the dated nature of some of the information contained therein. Defendants argue that, because much of the evidence cited by Singler in the warrant applications had been gathered months previously, that information was stale. In response, the government first argues that the evidence was not stale because the information provided by Employee One corroborated other information gathered by Singler and demonstrated that violations that were occurring at Crown on a daily, continual basis. *See, e.g.*, *United States v. Spry*, 190 F.3d 829, 836 (7th Cir. 1999) (passage of time is less critical in establishing probable cause when affidavit demonstrates ongoing criminal activity). The court need not resolve the dispute because the third warrant application also contained a great deal of fresh information; namely, the EPA's test results, which confirmed that Crown was indeed discharging pollutants into the MWRD sewer system in violation of federal regulations. The EPA's tests were certainly not stale—they were conducted immediately prior to the third warrant application. Defendants' third and final argument fails for this same reason; although Employee One may have harbored ill will towards Crown for firing him two days before Christmas, the information he conveyed to Singler was independently verified by the EPA's tests, and so there was no reason for the magistrate judge considering the third warrant application to doubt Employee One's veracity. As all of defendants' attacks on the

third warrant lack merit, the court concludes that the third warrant was supported by adequate probable cause.

### III. CONCLUSION

For the foregoing reasons, defendants' motion to suppress is denied.

SIGNED:

/s/
Joan B. Gottschall
United States District Judge

Dated: June 28, 2007