# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| UNITED STATES ) | |
| ) | Case No. 06 CR 545 |
| v. ) | |
| ) | Judge Joan B. Gottschall |
| JAMES E. SPAIN ) | |

## MEMORANDUM OPINION AND ORDER

Defendant James Spain has pled guilty to Count One of the indictment, violating 18 U.S.C. §§ 371 and 2 by conspiring to knowingly violate the Clean Water Act ("CWA"), 33 U.S.C. § 1319(c)(2)(A). A sentencing hearing was held on November 3, 2008. This order determines Spain's applicable sentencing range under the Federal Sentencing Guidelines.

For the reasons stated below, Spain is assigned a base-level of six under U.S.S.G. § 2Q1.3, an increase of four under § 2Q1.3(b)(1), an increase of four under § 3B1.1(a), and a decrease of two under § 3E1.1(a), for an adjusted level of twelve. Pursuant to the Guidelines, the recommended sentencing range of the Guidelines is 10–16 months.

## I. BACKGROUND

Defendant Spain pled guilty to discharging industrial wastewater or effluent with abnormally high or low pH levels[1] into the sewer system. Spain owned and operated Crown Chemical for decades, inheriting a predecessor company from his father. Crown Chemicals produces various cleaning chemicals for both domestic and industrial use. Crown Chemical uses

---

[1] A pH level is a measure of acidic or caustic character. A measure of 7 is "neutral." Pure water has a pH of 7. Lower numbers are more acidic; higher numbers are more caustic. The scale is a logarithmic scale, such that every change of a whole pH level represents a ten-times change in strength. Thus a pH of 5 is ten times more acidic than a pH of 6, and a pH of 4 is 100 times more acidic than a pH of 6.

mixing tanks to produce these chemicals. Residue wastewater that was left over in the mixing tanks would be discharged into the sewer system without being treated.[2] This practice started no later than 1986, and continued until 2001. On certain occasions, Spain's employees expressed concern to Spain that this activity was illegal, but Spain declined to change this practice.

Spain was charged on several counts related to illegal discharge. He entered into a plea agreement as to Count I of the indictment; both Count I and the plea agreement acknowledge unlawful discharge of materials into the sewer that had a pH of less than 5 and greater than 10. Though not reflected in either the indictment or the plea agreement, covert surveillance by Environmental Protection Agency ("EPA") agents in the sewer system connected to and surrounding Crown Chemicals detected discharges that were below 2.0 pH and above 12.5 pH. Though the plea agreement is silent on this point, both parties agree that there is no evidence that Crown's discharges into the sewer system interfered with the relevant Metropolitan Water Reclamation District ("MWRD") treatment plant, that the discharged material ultimately "passed through" the treatment plant and into the broader environment, or that the discharged material caused any actual environmental harm.

## II. ANALYSIS

Although district courts are not to apply "any thumb on the scale favoring a [Federal Sentencing G]uideline sentence," a court is nevertheless "ordinarily obliged to first consider the presentence report and its calculation of the Guidelines and then consider the respective parties' arguments as to whether the Guidelines sentence should apply." *United States v. Allday*, 542

---

[2] For example, the wastewater could have been treated so as to bring its pH levels into an acceptable range before being discharged into the sewer system. This practice now occurs at Crown Chemical.

F.3d 571, 572–73 (7th Cir. 2008) (quotation omitted). The parties disagree with each other and with the Presentence Investigation Report ("PSR") both in terms of what section of the Guidelines is applicable (and therefore what base offense level applies), and also as to the propriety of certain increases and decreases within the selected section.

A.   Guidelines Section And Base Offense Level

Both parties agree that the 2007 Guidelines are controlling. The parties disagree over which section of the Sentencing Guidelines is applicable. The crux of this dispute is whether the court should limit its inquiry to the facts set forth in the plea agreement and indictment when deciding which section of the Guidelines is appropriate, or whether it may also consider Spain's relevant conduct, assuming it can be proven by a preponderance of the evidence. This is a rare question, for there is generally a direct correlation between the underlying statute of conviction and the corresponding sections of the Guidelines. Here, however, under the Guidelines either of two sections could apply.

The dispute is between Sections 2Q1.2 and 2Q1.3. Section 2Q1.2 applies to the mishandling of hazardous or toxic substances and has a base level of eight. As application note 3 to Section 2Q1.2 directs, this section applies where the material in question is deemed to be toxic or hazardous, by statute or regulation, at the time of the offense. U.S.S.G. § 2Q1.2 app. note 3. Section 2Q1.3 applies to the mishandling of environmental pollutants and has a base level of six; section 2Q1.3 "parallels § 2Q1.2 but applies to offenses involving substances which are not pesticides and are not designated as hazardous or toxic." § 2Q1.3 background note. The government advocates for § 2Q1.2, under a theory that the material that was actually discharged—with a pH of less than 2.0 and greater than 12.5—is a hazardous waste as defined

3

by the Resource Conservation and Recovery Act ("RCRA"). Spain asserts that § 2Q1.3 is correct. The PSR recommends § 2Q1.3.

The first step in applying the Guidelines is to select the appropriate offense guideline section. U.S.S.G. § 1B1.1 ("Except as specifically directed, the provisions of this manual are to be applied in the following order: (a) Determine, pursuant to §1B1.2 (Applicable Guidelines), the offense guideline section from Chapter Two (Offense Conduct) applicable to the offense of conviction. See §1B1.2. . . . ."). Section 1B1.2 states as follows:

> (a) Determine the offense guideline section in Chapter Two (Offense Conduct) applicable to the offense of conviction (*i.e.*, the offense conduct charged in the count of the indictment or information of which the defendant was convicted). However, in the case of a plea agreement (written or made orally on the record) containing a stipulation that specifically establishes a more serious offense than the offense of conviction, determine the offense guideline section in Chapter Two applicable to the stipulated offense.
>
> Refer to the Statutory Index (Appendix A) to determine the Chapter Two offense guideline, referenced in the Statutory Index for the offense of conviction. If the offense involved a conspiracy, attempt, or solicitation, refer to §2X1.1 (Attempt, Solicitation, or Conspiracy) as well as the guideline referenced in the Statutory Index for the substantive offense. . . . .

U.S.S.G. § 1B1.2(a). Spain pled to and was indicted for conspiracy. Section 2X1.1(a) directs that the base offense level for a conspiracy should be "[t]he base offense level from the guideline for the substantive offense, plus any adjustments from such guideline for any intended offense conduct that can be established with reasonable certainty." § 2X1.1(a). The "substantive offense" in this case was 33 U.S.C. § 1319(c)(2)(A). The statutory index directs that either of two offense guideline sections, U.S.S.G. §§ 2Q1.2 or 2Q1.3, may be applicable to a violation of § 1319(c)(2)(A).

Returning to Section 1B1.2(a), the text states that the base offense level is to be determined specifically with reference to the "offense of conviction (*i.e.*, the offense conduct charged in the count of the indictment or information of which the defendant was convicted)." § 1B1.2(a). This is the general rule: the relevant offense guideline section is generally determined by looking at the offense charged in the indictment. Section 1B1.2(a) then goes on to state an exception to this general rule: "However, in the case of a plea agreement (written or made orally on the record) containing a stipulation that specifically establishes a more serious offense than the offense of conviction, determine the offense guideline section in Chapter Two applicable to the stipulated offense." *Id.* Therefore, any fact that has been stipulated to in a plea agreement may also be considered. The Seventh Circuit has interpreted the term "stipulation" broadly to include even a prosecutor's oral recitation of the factual basis, so long as the defendant orally agrees to the prosecutor's version of events and admits guilt. *United States v. Loos*, 165 F.3d 504, 506–08 (7th Cir. 1998).

However, neither the *Loos* exception nor anything within the Guidelines suggests that a court may consider non-stipulated but relevant conduct when determining an appropriate offense guideline section. As *Loos* observes,"the Sentencing Guidelines establish a charge-offense system." *Id.* at 507. Facts found within stipulations may require a different section to be used, but this is a limited exception to the general rule and says nothing about relevant conduct found by the court but not stipulated to by the defendant. *See United States v. Goldfaden*, 959 F.2d 1324, 1329 (5th Cir. 1992) (holding that "relevant conduct" is not legitimate factor in determining which section of Guidelines to apply).

5

Finally, there is no dispute that the court may consider "relevant conduct" when determining the applicable guideline range found *within* the applicable offense guideline section. Section 1B1.3(a) is labeled "Relevant Conduct (Factors that Determine the Guideline Range)," and states explicitly that such conduct may be considered when calculating a defendant's guideline range:

> Unless otherwise specified, (i) the base offense level where the guideline specifies more than one base offense level, (ii) specific offense characteristics and (iii) cross references in Chapter Two, and (iv) adjustments in Chapter Three, shall be determined on the basis of the following:
>
>> (1)(A) all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant,
>
> . . . .

U.S.S.G. § 1B1.3(a); *see also* § 2X1.1(a) (". . . plus any adjustments *from such guideline* for any intended offense conduct that can be established with reasonable certainty.") (emphasis added). These examples, where the Guidelines explicitly state when relevant conduct should be considered, only strengthens the conclusion that relevant conduct should not be considered when determining the offense guideline level. The only conclusion that can be drawn is that the offense guideline section must be determined based strictly upon the facts set forth in the indictment, plea agreement, or as otherwise stipulated pursuant to the exception discussed in *Loos*.

Spain was indicted for and pled to discharging materials with a pH of less than 5.0 and greater than 10.0. There is no argument that this by itself constitutes a hazardous waste. Section § 2Q1.3 is applicable, and Spain is assigned a base offense level of six.

**B.     Increase Under § 2Q1.3(b)(1).**

Section 2Q1.3(b)(1) requires that the offense level be increased under the following circumstances:

> (A) If the offense resulted in an ongoing, continuous, or repetitive discharge, release, or emission of a pollutant into the environment, increase by 6 levels; or
> (B) if the offense otherwise involved a discharge, release, or emission of a pollutant, increase by 4 levels.

U.S.S.G. § 2Q1.3(b)(1). The government argues that a six-level increase should apply. Spain, and the PSR, both find such an increase inapplicable.

Spain engaged in an ongoing, continuous, and repetitive discharge of materials into the sewer system—the plea agreement states that this conduct occurred regularly over at least a sixteen year span. The material that was discharged was a pollutant. Based on testimony at the sentencing hearing, Spain discharged materials with pH levels below 2.0 and above 12.5. Under the RCRA, such acidic and caustic material is classified as a hazardous waste. 40 C.F.R. § 261.22.[3] Material qualified as a hazardous waste qualifies as a pollutant.

Spain argues that the six-level increase under subsection (b)(1)(A) nevertheless does not apply for two reasons. First, he argues that the materials were not discharged into the environment. All parties agree that the materials did not "pass through" the MWRD treatment plant and into the broader environment. *See* Gov't Commentary & Obj. to PSR 11 n.7. Nevertheless, this is not the applicable definition of "environment." In a case that is directly

---

[3] Spain argues that, because he discharged materials into the sewer system, the RCRA is inapplicable pursuant to its "domestic sewage" exception. *See* 42 U.S.C. § 6903(27). This is incorrect. Although there is a domestic sewage exception to the RCRA, this exception requires both that the material be discharged into the sewer (as it was here) *and* that the discharge "come[] from residences." *Comite Pro Rescate De La Salud v. Puerto Rico Aqueduct & Sewer Auth.*, 888 F.3d 180, 184–87 (1st Cir. 1989). It does not apply to industrial waste that happens to be mixed with residential waste in the sewer system. *Id.*

7

analogous to the case at bar, the Ninth Circuit concluded that dumping benzene into the sewer system met the "into the environment" standard at issue here, notwithstanding the explicit determination that (like here) the relevant treatment plant removed the benzene before it passed out into the broader waterways outside of the sewer system. *United States v. Van Loben Sels*, 198 F.3d 1161, 1167 (9th Cir. 1999). Spain attempts to distinguish *Van Loben Sels* because in *Van Loben Sels* a far greater volume of hazardous material was discharged. This is certainly true, but is of no consequence. The volume of material was not a factor that the court considered in reaching its conclusion.

Spain next argues that no actual environmental *harm* has been alleged. Again, this point is agreed; Spain's discharges did not cause any known harm to the MWRD treatment plant or to the environment. However, environmental *harm* is not the question presently being considered. Application note 4 to Section 2Q1.3 states the following:

> Subsection (b)(1) assumes a discharge or emission into the environment resulting in actual environmental contamination. A wide range of conduct, involving the handling of different quantities of materials with widely differing propensities, potentially is covered. *Depending upon the harm* resulting from the emission, release or discharge, the quantity and nature of the substance or pollutant, the duration of the offense and the risk associated with the violation, a departure of up to two levels in either direction from that prescribed in these specific offense characteristics may be appropriate.

U.S.S.G. § 2Q1.3 app. note 4 (emphasis added). As the language of this application note makes clear, there is an important distinction between environmental *contamination* and environmental *harm*. Lack of harm is an important factor in determining whether or not to depart from the six-level increase of subsection (b)(1), but the court must first determine whether environmental contamination occurred. Spain's argument—that an increase under subsection (b)(1) is warranted only upon a showing of environmental *harm*, is exactly contrary to the text of the

8

section and of the application note. *See United States v. Bogas*, 920 F.2d 363, 367–67 (6th Cir. 1990) (noting that the "express command of a guideline section" cannot be "countermanded by the commentary"); *Van Loben Sels*, 198 F.3d at 1167.

Considering the length of time that this practice had occurred, that the material was a pollutant, and that the discharge was into the environment, an increase of six levels under section 2Q1.3(b)(1) is appropriate. However, all are in agreement that no actual harm occurred from this practice, notwithstanding a *risk* of harm to the Crown Chemical employees, and some potential *risk* to sewage treatment workers. Pursuant to application note 4, a decrease of two levels is appropriate due to the lack of any actual environmental harm. Spain's offense level is therefore increased by four levels pursuant to section 2Q1.3(b)(1).

**C.**     **Increase Under § 2Q1.3(b)(4).**

"If the offense involved a discharge without a permit or in violation of a permit," the level is to be increased by four. U.S.S.G. § 2Q1.3(b)(4). The application note states further that

> Subsection (b)(4) applies where the offense involved violation of a permit, or where there was a failure to obtain a permit when one was required. Depending upon the nature and quantity of the substance involved and the risk associated with the offense, a departure of up to two levels in either direction may be warranted.

U.S.S.G. § 2Q1.3(b)(4) app. note 7. The government argues for a four-level increase, with which the PSR concurs. Spain argues either for no increase, or in the alternative for two-levels to be taken off of the four-level increase.

Both parties agree that Spain made material misrepresentations on his application for a sewer hookup permit, which prohibited the discharge of any industrial wastewater into the MWRD sewer system. *See* Plea Agmt. 7. However, Spain points out that this local permit is not

9

enforceable under the CWA, the Act under which he was indicted and pled guilty. Spain alleges that this is significant, for although U.S.S.G. § 2Q1.3(b)(4) does not state whether the permit violation must be federally enforceable, the Second and Third Circuits have both concluded in the affirmative in the context of the Clean Air Act. In *United States v. Chau*, 293 F.3d 96 (3d Cir. 2002), the Third Circuit focused especially on the word "involved," and concluded that for a permit to be "involved," it must be "integral to the violation," not merely incidental to the charged offense. *Id.* at 102; *see also United States v. Rubinstein*, 403 F.3d 93, 100–01 (2d Cir. 2005).

The *Chau* analysis is appropriate here. Spain's indictment and guilty plea related to his underlying actions—the discharge of materials in violation of 33 U.S.C. § 1319(c)(2)(A). His conduct also violated his sewer hookup permit, but that was not an element of the federal offense with which he was charged. Spain was prosecuted for the discharge, but both parties agree that he was not and could not be charged under the CWA for the permit violation itself. *Cf. Chau*, 293 F.3d at 102 ("The fact is that under the enforcement procedure of the Clean Air Act, there are no penalties for violating a permit.").

The government argues that the permit increase is nevertheless warranted because the CWA involves interrelated levels of enforcement between local, state, and federal authorities, and that the sewer permit process put Spain on notice that his actions were illegal. This is not persuasive. Spain was on notice that he was violating the law generally and the local sewage hookup permit specifically, but the sewage permit process could not have given Spain notice that he was violating 33 U.S.C. § 1319(c)(2)(A).

Because the permit is not enforceable under the CWA, an increase under § 2Q1.3(b)(4) is not warranted.

**D.     Other Guideline Factors Agreed To By The Parties.**

All parties agree that Spain was a leader and organizer in furtherance of the offense, and have stipulated to a four-level aggravating role increase under U.S.S.G. § 3B1.1(a). All parties agree that Spain has satisfied the criteria of U.S.S.G. § 3E1.1(a), and a two-level decrease is warranted.

### III.  CONCLUSION

Spain has a base offense level of six under U.S.S.G. § 2Q1.3, an increase of four under § 2Q1.3(b)(1), an increase of four under § 3B1.1(a), and a decrease of two under § 3E1.1(a). Under the Guidelines Spain has an adjusted offense level of twelve (6+4+4-2=12). Spain has no criminal history. The recommended sentencing range of the Guidelines is 10–16 months.

ENTER:

/s/
JOAN B. GOTTSCHALL
United States District Judge

DATED:   December 16, 2008